## AFFIDAVIT IN SUPPORT OF APPLICATIONS FOR SEIZURE WARRANTS

I, Special Agent Adam Rayho, being duly sworn, hereby declare as follows:

### *INTRODUCTION AND AGENT BACKGROUND*

1.      I am a Special Agent with Homeland Security Investigations ("HSI") assigned to the Boston Field Office and have been employed by HSI since May 2023.  My primary responsibility is as a criminal investigator assigned to the Cyber Crimes Group.  As a member of the Cyber Crimes Group, I am responsible for conducting investigations involving crimes that have a nexus to the clearnet or dark web.[1]  Prior to becoming a Special Agent, I was a detective with the Nashua, New Hampshire Police Department, and a deputized task force officer (TFO) for HSI.  I became a certified police officer in the State of New Hampshire in May 2014 after graduating from the 164th New Hampshire Police Standards and Training Academy.  I hold a bachelor's degree in criminal justice, with a minor in computer science and victimology, from Endicott College.  I am a "federal law enforcement officer" within the meaning of Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent engaged in enforcing the criminal laws and duly authorized by the Attorney General to request a search warrant.

2.      During my career, I have participated in investigations involving the illegal counterfeiting, importation, manufacturing, distribution, and trafficking of contraband including firearms and trademarked items.

---

[1] The clearnet is a term that typically refers to the publicly accessible Internet.  Sometimes "clearnet" is used as a synonym for "surface web"—excluding both the darknet and the deep web.  The darknet is comprised of a variety of networks, such as Tor, that exist on a portion of the internet accessible only through specific software, such as the Tor browser (a legal and publicly available free application).  The deep web is part of the World Wide Web whose contents are not indexed by a standard web search engine program.

3.      As part of my duties, I am currently participating in an investigation into various websites that are selling items prohibited under the National Firearms Act and that infringe on multiple trademarks held by Glock, Inc.  Once purchased, the contraband items are shipped from China into the United States.  The advertisement, sale, and importation of these items violates 18 U.S.C. § 545 (Smuggling goods into the United States) and 18 U.S.C. § 2320(a) (Trafficking in counterfeit goods).

4.      The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

### PURPOSE OF AFFIDAVIT

5.      This affidavit is presented in support of applications for seizure warrants for the following Internet domains:

a.    switchglock[.]com[2] ("SUBJECT DOMAIN 1"), which is registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia;

b.    fuelfiltertrap[.]com ("SUBJECT DOMAIN 2"), which is registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia;

c.    solventtrapwholesale[.]com ("SUBJECT DOMAIN 3"), which is registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia;

---

[2] Throughout this affidavit I have placed brackets (e.g., "[.]com") within the domain names and email addresses of targets and/or subjects of the investigation.  These brackets, referred to as "blocks," are designed to prevent inadvertent connections.

    d.   gunglock[.]com ("SUBJECT DOMAIN 4"), which is registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia;

    e.   buyforswitch[.]com ("SUBJECT DOMAIN 5"), which is registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia;

    f.   autoglock[.]com ("SUBJECT DOMAIN 6"), which is registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia;

    g.   fullautosear[.]com ("SUBJECT DOMAIN 7"), which is currently unregistered, and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia;

    h.   metalfidget[.]com ("SUBJECT DOMAIN 8"), which is registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia;

    i.   filtersolventtrap[.]com ("SUBJECT DOMAIN 9"), which is registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia;

    j.   solventtrapshop[.]com ("SUBJECT DOMAIN 10"), which is registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia;

    k.   neonsignfor[.]com ("SUBJECT DOMAIN 11"), which is registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia;

    l.   solventtrapsuppressors[.]com ("SUBJECT DOMAIN 12"), which is registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia;

    m.   solventtrapfuel[.]com ("SUBJECT DOMAIN 13"), which is registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia;

n. fuelfiltersolventtrap[.]com ("SUBJECT DOMAIN 14"), which is registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia;

o. wowautopart[.]com ("SUBJECT DOMAIN 15"), which is registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia;

p. vaccap[.]com ("SUBJECT DOMAIN 16"), which is registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia;

q. fuelfiltershop[.]com ("SUBJECT DOMAIN 17"), which is registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia;

r. usglockswitch[.]com ("SUBJECT DOMAIN 18"), which is registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia;

s. suppressorkit[.]com ("SUBJECT DOMAIN 19"), which is registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia;

t. kinglyday[.]com ("SUBJECT DOMAIN 20"), which is registered with NameSilo LLC in the United States, a company located in Phoenix, Arizona, and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia;

u. carsfuelfilter[.]com ("SUBJECT DOMAIN 21"), which is registered with Alibaba Cloud Computing Ltd. d/b/a HiChina, located in the People's Republic of China, and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia;

v. glockswitch[.]com ("SUBJECT DOMAIN 22"), which is registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia;

w. glockfull[.]com ("SUBJECT DOMAIN 23"), which is registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia;

x.  glock-switch[.]com ("SUBJECT DOMAIN 24"), which is currently unregistered, and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia;

y.  solvent-trap[.]shop ("SUBJECT DOMAIN 25")[3], which is registered with Alibaba Cloud Computing Ltd. d/b/a HiChina, located in the People's Republic of China, and for which the registry for the top-level domain is GMO Registry, Inc., a company in Tokyo, Japan; and

z.  The domains identified in Attachment A-1 as SUBJECT DOMAIN 26 to SUBJECT DOMAIN 355, specifically:

    i.  SUBJECT DOMAINS 26-30, 32-71, 73-107, 112-116, 118-122, 126-129, 133-156, 158-235, 250-255, 258-282, 296-297, 300-301, 306-307, 309-311, 316-327, 329-331, 333-336, and 338-351, as further described in Attachment A-2, which are registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Verisign, a company in Reston, Virginia;

    ii.  SUBJECT DOMAINS 31, 72, 108, 111, 124, 131, 157, 256-257, 283, 312, 314-315, 337, and 353-355, as further described in Attachment A-2, which are registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Registry Services LLC, a company in Tempe, Arizona;

    iii.  SUBJECT DOMAINS 109, 117, 125, 132, 285, and 299, as further described in Attachment A-2, which are registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Identity Digital Inc., a company in Bellevue, Washington;

    iv.  SUBJECT DOMAINS 110, 123, 130, 284, 298, 308, 313, 328, and 332, as further described in Attachment A-2, which are registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Public Interest Registry, a company in Reston, Virginia;

    v.  SUBJECT DOMAIN 236, as further described in Attachment A-2, which is registered with GoDaddy.com, LLC in the United States, a company

---

[3] The government is **not** seeking a seizure warrant with respect to SUBJECT DOMAIN 25 from the Court at this juncture, as both the registry and top-level domain manager for SUBJECT DOMAIN 25 are located abroad. The government intends to seek the seizure of this domain via international process, but has included information regarding this domain in the affidavit for the sake of completeness.

located in Tempe, Arizona, and for which the registry for the top-level domain is ICM Registry PN LLC, a company in Tempe, Arizona;

vi.   SUBJECT DOMAINS 237-239, 241-242, 244-245, 247-249, 286-289, 292-295, and 302-305, as further described in Attachment A-2, which are registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Binky Moon, LLC, a company in Bellevue, Washington;

vii.   SUBJECT DOMAIN 240, as further described in Attachment A-2, which is registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is ICM Registry AD LLC, a company in Tempe, Arizona; and

viii.   SUBJECT DOMAINS 243, 246, 290-291, and 352, as further described in Attachment A-2, which are registered with GoDaddy.com, LLC in the United States, a company located in Tempe, Arizona, and for which the registry for the top-level domain is Dog Beach, LLC, a company in Bellevue, Washington;

(collectively, the "SUBJECT DOMAINS").

6.   As set forth below, there is probable cause to believe that the SUBJECT DOMAINS are property, used, or intended to be used, to commit, or facilitate, violations of federal law including 18 U.S.C. § 545 (Smuggling goods into the United States) [SUBJECT DOMAINS 1-25]; and 18 U.S.C. § 2320(a) (Trafficking in counterfeit goods) [SUBJECT DOMAINS 1-14, 18, 22-24, and 26-355], (collectively, the "TARGET OFFENSES").

7.   As further set forth below, there is probable cause to believe that the SUBJECT DOMAINS are subject to seizure and forfeiture to the United States pursuant to the seizure authority set forth herein.

### *BACKGROUND*

#### Importation of MCDs Violates Federal Law

8.   Machine gun conversion devices ("MCDs") are parts designed to convert semiautomatic pistols or semiautomatic rifles into fully automatic machine guns.  Such parts are

commonly referred to as "Glock switches[4]" or "auto sears."  MCDs also encompass devices used to suppress the sound of a firearm when discharged; such devices are commonly referred to as "silencers and suppressors."  Possession of these items and their importation from certain countries, including China, are prohibited under the National Firearms Act ("NFA"), 26 U.S.C. §§ 5861 and 5845[5], along with 27 C.F.R. Part 447 in which the United States prohibits imports of Chinese defense articles into the United States if the item is covered by the United States Munitions "Import" List.[6]

9.      Specifically, pursuant to 26 U.S.C. § 5845(a)(6), the term "firearm" is defined to include a "machinegun."  In turn, the term a "machinegun" is defined by 26 USC § 5845(b) as "any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger. The term shall also include the frame or receiver of any such weapon, any part designed and intended solely and exclusively, or combination of parts designed and intended, for use in converting a weapon into a machinegun, and any combination of parts from which a machinegun can be assembled if such parts are in the possession or under the control of a person."

---

[4] HSI agents have spoken with representatives of Glock, Inc., who advised they have never made a device capable of being inserted into the rear of a pistol to make the firearm function as fully automatic. Thus, while commonly referred to as a "Glock switch," such MCDs are not in fact manufactured by Glock, Inc, despite frequently being embossed with the Glock, Inc. logo or sold on websites which use the trademarked Glock name or branding.

[5] *See also* 18 U.S.C § 922(o).

[6] The U.S. Munitions Import List includes "[a]utomatic firearms and all components and parts for such firearms to caliber .50 inclusive," as well as "[f]irearms silencers and suppressors, including flash suppressors."  *See* 27 C.F.R. § 447.21 at Category I, subsections b, d.

10.     When inserted into a firearm, "Glock switches" and "auto sears" meet the definition of a "machinegun"—and thus, they also meet the definition of a "firearm" under 26 U.S.C. § 5845(a)(6)—as they allow the individual more than one shot without manual reloading.

11.     Pursuant to 26 U.S.C. § 5845(a)(7), the term "firearm" is also defined to include "any silencer (as defined in section 921 of title 18, United States Code)."  The term "firearm silencer" is in turn defined by 18 U.S.C. § 921(a)(25) as "any device for silencing, muffling, or diminishing the report of a portable firearm, including any combination of parts, designed or redesigned, and intended for use in assembling or fabricating a firearm silencer or firearm muffler, and any part intended only for use in such assembly or fabrication."

12.     The silencers and suppressors discussed throughout this affidavit meet the definition of a "firearm" under 26 U.S.C. § 5845(a)(6) as they are intended to silence, muffle, or diminish the sound of a firearm when discharged.

13.     Pursuant to 26 U.S.C. § 5844, "[n]o firearm shall be imported or brought into the United States or any territory under its control or jurisdiction unless the importer establishes, under regulations as may be prescribed by the Secretary, that the firearm to be imported or brought in is—

(1) being imported or brought in for the use of the United States or any department, independent establishment, or agency thereof or any State or possession or any political subdivision thereof; or

(2) being imported or brought in for scientific or research purposes; or

(3) being imported or brought in solely for testing or use as a model by a registered manufacturer or solely for use as a sample by a registered importer or registered dealer;

except that, the Secretary may permit the conditional importation or bringing in of a firearm for examination and testing in connection with classifying the firearm."

14.     Pursuant to 26 U.S.C. § 5861, it is unlawful for any person to "(e) to transfer a firearm in violation of the provisions of this chapter"; "(f) to make a firearm in violation of the provisions of this chapter"; "(j) to transport, deliver, or receive any firearm in interstate commerce which has not been registered as required by this chapter;" or "(l) to make, or cause the making of, a false entry on any application, return, or record required by this chapter, knowing such entry to be false."

15.     Throughout this investigation multiple individuals and/or companies in China imported firearms into the United States without establishing the regulations under 26 U.S.C. § 5844 described above.  The individuals and/or companies in China also violated 26 U.S.C. § 5861 (e) by transferring a firearm, (f) making a firearm, (j) transporting or delivering a firearm in interstate commerce which had not been registered as required, and (l) to make or cause the making of, a false entry on any application, return or record required by the chapter.

16.     The MCDs at issue throughout this affidavit—including Glock switches, auto sears, suppressors, and silencers—were imported into the United States in violation of the provisions of the NFA, as discussed above.  Their importation thus violates 18 U.S.C. § 545 (Smuggling goods into the United States), which makes it illegal to import into the United States "any merchandise contrary to law."

<u>Trafficking of Counterfeit Goods Violates Federal Law</u>

17.     Federal law further prohibits the trafficking of counterfeit goods or services. Pursuant to 18 U.S.C. § 2320(a)(1), "whoever intentionally traffics in goods or services and knowingly uses a counterfeit mark on or in connection with such goods or services"—or attempts or conspires to do so—shall be punished according to law.  In this context, the term "traffic" means "to transport, transfer, or otherwise dispose of, to another, for purposes of

commercial advantage or private financial gain, or to make, import, export, obtain control of, or possess, with intent to so transport, transfer, or otherwise dispose of."  18 U.S.C. § 2320(f)(5).

18.    The term "counterfeit mark" is defined as:

(A) a spurious mark—

    (i)    that is used in connection with trafficking in any goods, services, labels, patches, stickers, wrappers, badges, emblems, medallions, charms, boxes, containers, cans, cases, hangtags, documentation, or packaging of any type or nature;

    (ii)    that is identical with, or substantially indistinguishable from, a mark registered on the principal register in the United States Patent and Trademark Office and in use, ***whether or not the defendant knew such mark was so registered***;

    (iii)    that is applied to or used in connection with the goods or services for which the mark is registered with the United States Patent and Trademark Office, or is applied to or consists of a label, patch, sticker, wrapper, badge, emblem, medallion, charm, box, container, can, case, hangtag, documentation, or packaging of any type or nature that is designed, marketed, or otherwise intended to be used on or in connection with the goods or services for which the mark is registered in the United States Patent and Trademark Office; and

    (iv)    the use of which is likely to cause confusion, to cause mistake, or to deceive.

18  U.S.C. § 2320(f)(1)(A) (emphases added).

19.    As discussed herein, the majority of the SUBJECT DOMAINS have been used to facilitate either the trafficking in counterfeit goods or the attempt or conspiracy to do so.  The particular SUBJECT DOMAINS at issue[7] primarily violate two trademarks held by Glock, Inc. which were registered in relation to component parts for firearms.  First, by placing the below

---

[7] Specifically, SUBJECT DOMAINS 1, 4, 6, 18, 22, 23, 24, and 26-355 all contain at least one of Glock's trademarks in the URL name; SUBJECT DOMAINS 2, 3, 5, 8, 10, 12, 13, and 14 were used to purchase MCDs with the trademarked Glock logo (SUBJECT DOMAINS 13 and 14 each redirected to SUBJECT DOMAIN 12, from which a purchase of an MCD with the trademarked Glock logo was made); and SUBJECT DOMAINS 7, 9, and 11 displayed MCDs with the trademarked Glock logo.

Glock emblem on merchandise, the sellers of the items procured through certain of the SUBJECT DOMAINS are portraying the item sold was made by Glock, Inc., which it was not.



Additionally, by incorporating the term "Glock" or models of Glock, Inc. firearms such as "G17" or "G24" into the URL of certain of the SUBJECT DOMAINS, those URL names violate Glock, Inc.'s multiple trademarks to the word "Glock,"[8] and incorrectly represent the items listed on the certain of the SUBJECT DOMAINS to be sold or supported by Glock, Inc. in a way that is likely to cause confusion, to cause mistake, or to deceive.

<u>Statutory Bases for Seizure and Forfeiture</u>

20.     As set forth below, there is probable cause to believe that the SUBJECT DOMAINS are property used, or intended to be used to commit, or to facilitate the commission of violations of federal law, including:  18 U.S.C. § 545 (Smuggling goods into the United States) [SUBJECT DOMAINS 1-25]; and 18 U.S.C. § 2320(a) (Trafficking in counterfeit goods) [SUBJECT DOMAINS 1-14, 18, 22-24, and 26-355].

---

[8] This includes US Registration Number 4925475, which covers use of the word "Glock" in relation to "[o]n-line retail gift shops" and  "[o]n-line retail store services featuring firearms accessories and gifts."

21.     Title 19, United States Code, Section 1595a(a) (Aiding unlawful importation) is a customs statute that sets forth seizure and forfeiture authority for property used to facilitate the importation of illegal articles into the United States.  It states in relevant part:

> [E]very vessel, vehicle, animal, aircraft, *or other thing used* in, to aid in, or *to facilitate,* by obtaining information or *in any other way*, the importation . . . of any article which is being or has been introduced, or attempted to be introduced, into the United States contrary to law . . . may be seized and forfeited[.]

(emphases added).  Because SUBJECT DOMAINS 1-25 are being used to facilitate the importation of MCDs into the United States in violation of 18 U.S.C. § 545—*i.e.*, "contrary to law"—they are subject to forfeiture.

22.     In addition to 19 U.S.C. § 1595a(a), which specifically references both seizure and forfeiture authority, 19 U.S.C. § 1603(a) provides that "[a]ny property which is subject to forfeiture to the United States for violation of the customs laws . . . may be seized by the appropriate officer or person upon process issued in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure.  This authority is in addition to any seizure authority otherwise provided by law."

23.     Pursuant to 18 U.S.C. § 2323(a)(1)(B), any property used, or intended to be used, in any manner or part to commit or facilitate the commission of an offense in violation of 18 U.S.C. § 2320 (Trafficking in counterfeit goods) is subject to civil forfeiture to the United States. Pursuant to 18 U.S.C. § 2323(b)(1), any property used, or intended to be used, in any manner or part to commit or facilitate the commission of an offense in violation of 18 U.S.C. § 2320 is also subject to criminal forfeiture to the United States.

24.     This Court has authority to issue a seizure warrant, pursuant to 18 U.S.C. § 981(b)(2), incorporated by 18 U.S.C. § 2323(a)(2), which states that "seizures pursuant to this

section shall be made pursuant to a warrant obtained in the same manner as provided for a search warrant under the Federal Rules of Criminal Procedure."

25.     Pursuant to 28 U.S.C. § 1355(b), district courts have original jurisdiction for forfeiture proceedings in the district in which any of the acts or omissions giving rise to the forfeiture occurred.  This Court has jurisdiction to issue the requested seizure warrants because acts and omissions in furtherance of the offenses under investigation occurred within Massachusetts; namely, the SUBJECT DOMAINS were accessed from Massachusetts and the contraband items purchased from the SUBJECT DOMAINS were shipped to Massachusetts.

26.     Based on my training and experience, neither a restraining order nor an injunction is sufficient to guarantee the availability of the SUBJECT DOMAINS for forfeiture because, as discussed in more detail above, the owners of the SUBJECT DOMAINS have the ability to move them to another computer/server or a third-party hosting service outside of the United States beyond this Court's jurisdiction to anywhere in the world.  In addition, by seizing the SUBJECT DOMAINS, the government will prevent the continued use of those websites to commit the TARGET OFFENSES.

<u>Background on Domain Names</u>

27.     Based on my training and experience, I know that domain names are part of a system employed to identify computers on the Internet, using a series of characters (<u>e.g.</u>, letters, numbers, or other symbols) that correspond with a particular IP address.[9]  For example, "<u>usdoj.gov</u>," "<u>Wikipedia.org</u>," and "<u>Reddit.com</u>" are all domain names.

---

[9] Based on my training and experience, I know that an "IP address," or "Internet Protocol address," is a unique numeric address used by computers on the Internet.  Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  The assignment of IP addresses to computers connected to the Internet is controlled by Internet service providers.

28.     I further know that the domain name system (DNS) is, among other things, a hierarchical convention for domain names.  Specifically, domain names are composed of one or more parts, or "labels," that are delimited by periods, such as "example.com" or "example.net." The hierarchy of domains descends from right to left.  Using this system, each label to the left specifies a subdivision, or subdomain, of the domain on the right. The right-most label conveys the "top-level" domain.  For instance, the domain name "example.com" means the computer assigned that name is in the ".com" top-level domain, and the "example" is the second level domain and represents a specific web server.[10]

29.     I further know that for each top-level domain (such as ".com"), there is a single company, called a "registry," that determines which second-level domain resolves to which IP address.  For example, the registry for the ".com" and ".net" top-level domains is VeriSign, Inc., which has its headquarters at 21355 Ridgetop Circle, Dulles, Virginia.  In addition, the registry for the ".blog" top-level domain used by the BEG website is Automattic Inc. (WordPress.com), which has its headquarters at 60 29th Street #343, San Francisco, California.

30.     Domain names may be purchased through a "registrar," which acts as the intermediary between the registry and the purchaser of the domain name.  The individual or business that purchases a domain name from a registrar is called a "registrant."  Registrants can either host the domain or utilize a third-party service provider to resolve the domain name to an IP address.  Thus, a registrant has the ability to move a domain name to another computer/server or a third-party hosting service anywhere in the world.

---

[10] Based on my training and experience, I know that a web server is a computer that stores web server software and a website's components.  A web server connects to the Internet and supports physical data interchange with other devices using the web.

### PROBABLE CAUSE

<u>Background of the Investigation</u>

31.     In August 2023, HSI New England Cyber Crimes Group began targeting multiple clearnet websites, businesses, and individuals who are selling, offering for sale, importing, and exporting MCDs in violation of federal law.  In furtherance of this investigation, an HSI agent acting in an undercover capacity, hereafter the "UCA", visited and interacted with the SUBJECT DOMAINS on multiple occasions throughout the investigation and observed the content presented at the SUBJECT DOMAINS.  These visits and interactions confirmed the nature, functionality, and purpose of the SUBJECT DOMAINS.  As reflected below, that purpose has been to promote the sale of NFA-prohibited items[11].

32.     In August 2023, the UCA visited SUBJECT DOMAINS 1 and 22[12] and observed the following:

  a.  Upon visiting SUBJECT DOMAIN 1, an advertisement populated showing multiple "Glock switches" and auto sears, including one "Glock switch" inserted into the back of a pistol.  The top banner listed Telegram, WhatsApp, and email contact information.  The three main categories of the website included Home, Glock Switch, AR15 Switch, and Solvent Trap[13]

  b.  Upon visiting SUBJECT DOMAIN 22 an advertisement populated showing multiple "Glock switches" and auto sears, including one "Glock switch" inserted into the back of a pistol.  The top banner listed Telegram, WhatsApp, and email contact information.  The three main categories of the website included Home,

---

[11] *See* Attachment A-4 for pictures of NFA-prohibited items that were purchased during this investigation.  To avoid duplication of pictures for each purchase, only one picture of a Glock switch, auto sear, and suppressor are included.  While the color and shape of the other purchase may be different, the functionality is the same.

[12] Screenshots of various of the SUBJECT DOMAINS are included in Attachment A-5.

[13] So-called "solvent traps" are marketed as devices that attach to firearm barrels to catch excess solvent used when cleaning firearms.  Through my training and experience and throughout the course of this investigation, I have become aware that websites, including many of the SUBJECT DOMAINS, use the term "solvent trap" when they are actually referring to a suppressor and/or silencer.

Glock Switch, AR15 Switch, and Solvent Trap.  Furthermore, there was a section titled "What Is A Glock Switch" which stated, "A Glock switch or Glock auto-sear is a small device that can be attached to the rear of the slide of a Glock handgun, converting the semi-automatic pistol into a machine pistol capable of fully automatic fire".

    c.   On both SUBJECT DOMAINS 1 and 22, when a listing was clicked on, there was the option to purchase the item.

33.    In November 2023, the UCA visited SUBJECT DOMAIN 24, which re-directed to SUBJECT DOMAIN 6, and observed the following:

    a.   The main page was titled "Auto Sear" and had several sub-categories, including All Auto Sear, G Full Auto, A Full Auto, and Thread Adapter.  A video under the sub-categories showed several Glock switches.

    b.   In each sub-category were NFA-prohibited items.  Examples include Glock switches under the "G Full Auto" category  and auto sears under "A Full Auto" category.

    c.   Several postings on the main page showed Glock switches for sale that were marketed as "wholesale standard size universal stainless-steel material", "1st to 5th generation universal keychain stainless steel material", "switch keychain", and G17 and standard size universal cheap price online".

    d.   When a listing was clicked on, there was the option to purchase the item.

34.    In November 2023, the UCA visited SUBJECT DOMAIN 23, which re-directed to SUBJECT DOMAIN 8, and observed the following:

    a.   The main page was titled "Full Auto" and had several sub-categories[14] including Full Auto Sear and Solvent Trap.  The banner picture on the main page displayed several yellow Glock switches along with the statement, "Our switch is very simple to install without modifying the switch.  We ensure that you can receive it safely and confidential".

    b.   An advertisement on the main page included a listing for a Glock switch marketed as "G Switch Keychain Hot Wholesale 1st to 5th Generation Standard Size Universal No Need Modification".

---

[14] There were additional sub-categories which did not have advertisements for NFA-prohibited items.

   c.   A short video on the main page showed an individual holding one Glock switch bearing the Glock trademark logo with several additional Glock switches in the background.

   d.   The Full Auto Sear sub-category listed three Glock switches for sale.

   e.   The Solvent Trap sub-category listed multiple silencers/suppressors, marketed as "fuel filters" or "solvent traps" for sale.

   f.   When a listing was clicked on, there was the option to purchase the item.

35.    In November 2023, the UCA visited SUBJECT DOMAIN 9 and observed the following:

   a.   The main page displayed several listings for silencers/suppressors and one for a Glock switch marketed as "Keychain Best Sale (Shipped within 48 hours)".

   b.   When a listing was clicked on, there was the option to purchase the item.

36.    In November 2023, the UCA visited SUBJECT DOMAIN 10 and observed the following:

   a.   The main page displayed several listings for silencers/suppressors and one for a Glock switch marketed as "Keychain Best Sale (Shipped within 48 hours)".

   b.   When a listing was clicked on, there was the option to purchase the item.

37.    In November 2023, the UCA visited SUBJECT DOMAIN 19 and observed the following:

   a.   The main page displayed a large picture of a silencer/suppressor on the end of a firearm and stated, "Professional Supplier" and "Solvent Trap Kits, Solvent Trap Parts, Solvent Trap Suppressor".

   b.   A drop-down menu on the main provided several options for purchases of various silencers/suppressors.

   c.   In addition to the drop-down menu, there were approximately twenty silencers/suppressors listed on the main page.

   d.   When a listing was clicked on, there was an option to purchase the item.

38.    In November 2023, the UCA visited SUBJECT DOMAIN 21 and observed the following:

    a.   The main page displayed a large picture of the baffling used inside a silencer/suppressor along with the statement, "The solvent trap is designed to capture clean solvent for effective disposal".

    b.   There were several listings for various forms of silencers/suppressors.

    c.   A sub-category titled "Problem Guide" had a chart of various firearms and calibers to match the thread size of the silencer/suppressor with.

    d.   When a listing was clicked on, there was an option to purchase the item.

39.    In November 2023, the UCA visited SUBJECT DOMAIN 25 and observed the following:

    a.   The main page displayed a picture of the baffling used inside a silencer/suppressor along with the statement, "Prevent Corrosive Damage To Your Car".

    b.   There were two sub-categories listed at the top of the main page, "Solvent Trap" and "Blog". The Solvent Trap page had twenty-three silencers/suppressors marketed as "fuel filters" listed. The Blog page had several articles related to firearms such as, "Fuel Filter Solvent Trap Suppressor: your Ticket to a Quieter Shooting Experience" and "Fuel Filter Solvent Trap Suppressor: The Modern Shooter's Game-Changing Secret".

    c.   When a listing was clicked on, there was an option to purchase the item.

40.    In November 2023, the UCA visited SUBJECT DOMAIN 16 and observed the following:

    a.   The website offered several legitimate products for sale for categories such as home supplies, kitchen, garden, etc.

    b.   Searching for "fuel filter" or "solvent trap" produced several results for silencers/suppressors marketed as "fuel filters" or "solvent traps".

    c.   When a listing was clicked on, there was an option to purchase the item.

41.    In November 2023, the UCA visited SUBJECT DOMAIN 20 and observed the following:

    a.   The website offered several legitimate car products for sale.

    b.   On the main page was a listing displaying a silencer/suppressor, marketed as a "fuel filter" and "solvent trap".

    c.   Searching for "fuel filter" produced several results for silencers/suppressors marketed as "fuel filters" or "solvent traps".

    d.   When a listing was clicked on, there was an option to purchase the item.

42.    In November 2023, the UCA visited SUBJECT DOMAIN 12 and observed the following:

    a.   The main page was titled "Solvent Trap Store" and displayed a picture of a silencer/suppressor in several pieces.

    b.   Under "Our Products" on the main page was a picture of a Glock switch, marketed as "Full Auto 1st to 5th Generation Universal – Shipped within 24 hours".

    c.   Under the sub-category "Solvent Trap" were two listings for auto sears, marketed as "Accessories for 15 shipped within 24 hours within working days".

    d.   A sub-category titled "Problem Guide" had a chart of various firearms and calibers to match the thread size of the silencer/suppressor with.

    e.   When a listing was clicked on, there was an option to purchase the item.

43.    In November 2023, the UCA visited SUBJECT DOMAIN 15 and observed the following:

    a.   The website offered several legitimate car products for sale.

    b.   A sub-category on the main page "Fuel System" had a drop-down option for "Fuel Filter".

    c.   Within this category were several listings displaying pictures of silencers/suppressors, marketed as "fuel filters" or "solvent traps".

    d.   Within one listing for a "Aluminum ½-28 or 5/8-24 Car Fuel Filter 6 color housing Car Solvent Trap FOR NAPA WIX 24003" it stated, "great for a fuel filter, a dryer, a cleaner, work with Airsoft".

    e.   When a listing was clicked on, there was an option to purchase the item.

44.    In December 2023, the UCA visited SUBJECT DOMAIN 2 and observed the following:

    a.   The main page displayed several pictures and advertisements of silencers/suppressors, marketed as "fuel filters" or "solvent traps". There was also

19

one listing displaying a picture of a Glock switch marketed as "key chain 1st to 5th generation universal stainless steel (ship within 48 hours)".

    b. Upon clicking on the link for the Glock switch, there was a video of a Glock switch inserted into a pistol and being fired along with several customer reviews.

    c. When a listing was clicked on, there was the option to purchase the item.

45. In December 2023, the UCA visited SUBJECT DOMAIN 18 and observed the following:

    a. The main page displayed the title "Full Auto Sear" and stated, "Factory bulk stock, To Order WhatsApp / Telegram".

    b. A large picture on the main page displayed several Glock switches, one of which had Glock's trademark on it.

    c. A short video demonstrated how a Glock switch or auto sear would function on a firearm.

    d. There were several listings for Glock switches or auto sears marketed in various manners to include "Full Auto 1st to 5th Generation Universal – Shipped within 24 hours" (Glock switch) and "AR swift link type 1 Full Automatic Switch-Stainless Steel (Ships within 24 hours)" (auto sear).

    e. When a listing was clicked on, there was an option to purchase the item.

46. In December 2023, the UCA visited SUBJECT DOMAIN 5 and observed the following:

    a. The main page displayed a large picture of several Glock switches bearing the Glock trademark.

    b. Three sub-categories were at the top of the page, "G Switch, A Switch, and Solvent Trap".

    c. On the main page, there was a statement, "What does switches on a g do? The small device on the back of this G-style gun is an auto sear. Its ability to turn any gun into a fully automatic weapon".

    d. On the main page, under "The best sales" were several pictures of Glock switches bearing the Glock trademark marketed under various names such as "Hidden Stainless Steel Keychain Switch".

    e. When a listing was clicked on, there was an option to purchase the item.

47.    In December 2023, the UCA visited SUBJECT DOMAIN 4 and observed the

following:

      a.  On the top of the main page was the statement, "Telegram/WhatsApp XXX-XXX-4765[15] contact to buy".

      b.  There were four sub-categories, "G Switch, A Switch, All Switch, and Solvent Trap".

      c.  A video on the main page displayed a pistol with a Glock switch attached.

      d.  On the main page were several Glock switches bearing the Glock trademark listed under G Switch and several auto sears listed under AR Switch.

      e.  When a listing was clicked on, there was an option to purchase the item.

48.    In December 2023, the UCA visited SUBJECT DOMAIN 7[16] and observed the

following:

      a.  On the top of the main page was the statement, "Telegram/WhatsApp XXX-XXX-4765 contact to buy".

      b.  There were four sub-categories, "G Switch, A Switch, All Switch, and Solvent Trap".

      c.  A video on the main page displayed a pistol with a Glock switch attached.

      d.  On the main page were several Glock switches bearing the Glock trademark listed under G Switch and several auto sears listed under AR Switch.

      e.  When a listing was clicked on, there was an option to purchase the item.

49.    In March 2024, the UCA visited SUBJECT DOMAIN 11 and observed the

following:

      a.  The website offered several legitimate car products for sale.

---

[15] The full phone number is known to law enforcement, as are the rest of the phone numbers listed throughout this affidavit.

[16] SUBJECT DOMAIN 4 and SUBJECT DOMAIN 7 are designed very similarly if not exactly the same.

b. There were five sub-categories at the top of the main page, one of which was "Full Auto Sear".

c. Scrolling towards the bottom of the main page, under "Featured Collection" were listings displaying pictures of Glock switches bearing the Glock trademark marketed as various items such as "G Switch Keychain Stainless Steel Full Auto Keychain" and "G Switch Keychain".

d. An additional listing under "Featured Collection" was for an auto sear marketed as "4 8 piece and 8-piece repair jig kit".

e. The sub-category Full Auto Sear contained various listings for Glock switches and auto sears.

f. When a listing was clicked on, there was an option to purchase the item.

<u>Undercover Orders from SUBJECT DOMAINS</u>

50.     Beginning in August 2023, the UCA began the ordering process of one "Glock switch"[17] and one suppressor from SUBJECT DOMAIN 1 and SUBJECT DOMAIN 22. Following the start of the order, the UCA received an email containing a hyperlink to complete their order, which redirected them from SUBJECT DOMAINS 1 and 22 to SUBJECT DOMAIN 3.  On SUBJECT DOMAIN 3, the UCA was able to purchase the "Glock switch" and silencer/suppressor for $192.91 via credit card.  Following the purchase, the UCA received a tracking number that showed the package originated in China and transited to the United States. On or about September 11, 2023, the UCA retrieved a package from a government-controlled mailbox that contained one "Glock switch" and one silencer/suppressor.  On the "Glock switch" was Glock's trademarked logo.  U.S. Customs and Border Protection ("CBP") later advised when

_____

[17] As indicated above, while these items purport to be "Glock switches," Glock Inc. does not manufacture such an item and never has.

entering the United States, the cargo description for the package[18], was "Cue Fidget Spinner[19]". This description is inaccurate and does not describe the actual item which was shipped.

51.     On September 26, 2023, the UCA, started the ordering process for "Glock switches" from SUBJECT DOMAIN 1.  In response to the initiation of this order, the UCA received a link to a Bitly address[20].  The UCA clicked the Bitly link which directed the UCA to a new website, AliExpress[.]com, which had Glock Switches labeled as reflectors.  The UCA attempted to complete the purchase on AliExpress, however, AliExpress would not accept the UCA payment.  The UCA had previously communicated with the Glock Switch Vendor, via (XXX) XXX-1575, regarding Glock Switch purchases.  The UCA began to text the vendor regarding the failed purchase on SUBJECT DOMAIN 1 and AliExpress.  The vendor advised the UCA they would need to change the payment method to Bitcoin.  After this conversation, the UCA successfully completed a purchase via Bitcoin on or about September 29, 2023.  Following the purchase, the UCA received a tracking number that showed the package originated in China and transited to the United States.  On or about October 23, 2023, the UCA retrieved a package from a government-controlled mailbox that contained eighteen "Glock switches".  On the "Glock switches" were Glock's trademarked logo.  CBP later advised when entering the United States, the cargo description for the package was "Toys".  This description is inaccurate and does not describe the actual item which was shipped.

---

[18] The company shipping items to the United States provides the cargo description to Customs when completing entry forms.

[19] Through my training and experience I know companies shipping illegal items into the United States will inaccurately describe the items to help avoid detection by CBP because if accurately described, they would be easily seized.

[20] Bitly, is URL shortening service, which allows users to shorten website links and add these clickable links to their emails.

52.     In November 2023, the UCA visited SUBJECT DOMAIN 17 to purchase a silencer/suppressor but was re-directed to SUBJECT DOMAIN 19.  The UCA had previously visited SUBJECT DOMAIN 19 and observed it to advertise silencers/suppressors, marketed as "fuel filters" or "solvent traps" for sale.  The UCA was able to purchase one silencer/suppressor for $221.99 via credit card.  Following the purchase, the UCA received a tracking number that showed the package originated in China and transited to the United States.  On or about December 20, 2023, CBP seized the target package and located one silencer/suppressor which was later turned over to HSI.  Following the seizure, the UCA emailed[21] SUBJECT DOMAIN 19 and they agreed to send an additional silencer/suppressor.  After this conversation, the UCA received a tracking number that showed the package originated in China and transited to the United States.  On or about February 28, 2024, the UCA retrieved a package from a government-controlled mailbox that contained one silencer/suppressor.  CBP later advised when entering the United States, the cargo descriptions for the packages were "Doorbell" and "Necklace".  These descriptions are inaccurate and do not describe the actual items which were shipped.

53.     On or about November 7, 2023, the UCA visited SUBJECT DOMAIN 6 [22]to order a "Glock switch".  The UCA had previously visited SUBJECT DOMAIN 6 and observed it to advertise for sale "Glock switches", auto sears, and silencers/suppressors.  The UCA was able to purchase one "Glock switch" from SUBJECT DOMAIN 6 for $153.98 via credit card.  Following the purchase, the UCA received a tracking number that showed the package originated in China and transited to the United States.  On or about November 16, 2023, the UCA retrieved a package from a government-controlled mailbox that contained one "Glock switch".  On the

_____

[21] The UCA obtained an email address during the ordering process from SUBJECT DOMAIN 19.

[22] As referenced above SUBJECT DOMAIN 24 redirected to SUBJECT DOMAIN 6.

"Glock switch" was Glock's trademarked logo.  CBP later advised when entering the United States, the cargo description for the package was "Toys".  This description is inaccurate and does not describe the actual item which was shipped.

54.     On December 4, 2023, the UCA visited SUBJECT DOMAIN 20 to purchase a silencer/suppressor.  The UCA had previously visited SUBJECT DOMAIN 20 and observed it to advertise silencers/suppressors, marketed as "fuel filters" or "solvent traps" for sale.  The UCA was able to purchase one silencer/suppressor for $54.99 via credit card.  Following the purchase, the UCA received a tracking number that showed the package originated in China and transited to the United States.  On or about December 21, 2023, the UCA retrieved a package from a government-controlled mailbox that contained one silencer/suppressor.  CBP later advised when entering the United States, the cargo description for the package was "Gear Shift Knob".  This description is inaccurate and does not describe the actual item which was shipped.

55.     On or about December 6, 2023, the UCA visited SUBJECT DOMAIN 16 to purchase a silencer/suppressor.  The UCA had previously visited SUBJECT DOMAIN 16 and observed it to advertise silencers/suppressors, marketed as "fuel filters" or "solvent traps" for sale.  The UCA was able to purchase two silencers/suppressors from SUBJECT DOMAIN 16 for $53.10 via Bitcoin.  Following the purchase, the UCA received a tracking number that showed the package originated in China and transited to the United States.  On or about December 21, 2023, the UCA retrieved a package from a government-controlled mailbox that contained two silencers/suppressors.  CBP later advised when entering the United States, the cargo description for the package was "Tool Accessories".  This description is inaccurate and does not describe the actual item which was shipped.

56.     On or about December 12, 2023, the UCA visited SUBJECT DOMAIN 9 to purchase a "Glock switch" and was redirected to SUBJECT DOMAIN 10.  The UCA had previously visited SUBJECT DOMAIN 10 and observed it to advertise for sale "Glock switches" and silencers/suppressors.  The UCA was able to purchase one "Glock switch" from SUBJECT DOMAIN 10 for $146.98 via credit card.  Following the purchase, the UCA received a tracking number that showed the package originated in China and transited to the United States.  On December 21, 2023, the UCA retrieved a package from a government-controlled mailbox that contained one "Glock switch".  On the "Glock switch" was Glock's trademarked logo.  CBP later advised when entering the United States, the cargo description for the package was "Toy".  This description is inaccurate and does not describe the actual item which was shipped.

57.     On or about December 12, 2023, the UCA visited the websites SUBJECT DOMAIN 13 and SUBJECT DOMAIN 14 to purchase a "Glock switch".  Each website re-directed to SUBJECT DOMAIN 12.  The UCA had previously visited SUBJECT DOMAIN 12 and observed it to advertise for sale "Glock switches" and silencers/suppressors.  The UCA was able to purchase one "Glock switch" from SUBJECT DOMAIN 12 for $137.99 via credit card.  Following the purchase, the UCA received a tracking number that showed the package originated in China and transited to the United States.  On or about January 02, 2024, the UCA retrieved a package from a government-controlled mailbox that contained one "Glock switch".  On the "Glock switch" was Glock's trademarked logo.  CBP later advised when entering the United States, the cargo description for the package was "Toy".  This description is inaccurate and does not describe the actual item which was shipped.

58.     On or about December 12, 2023, the UCA visited SUBJECT DOMAIN 18 to purchase an auto sear.  The UCA had previously visited SUBJECT DOMAIN 18 and observed it

to advertise for sale "Glock switches", auto sears, and silencers/suppressors.  The UCA was able to purchase one auto sear from SUBJECT DOMAIN 18 for $90.00 via credit card.  Following the purchase, the UCA received a tracking number that showed the package originated in China and transited to the United States.  On or about January 2, 2024, the UCA retrieved a package from a government-controlled mailbox that contained one auto sear.  CBP later advised when entering the United States, the cargo description for the package was "Toy".  This description is inaccurate and does not describe the actual item which was shipped.

59.     On or about December 22, 2023, the UCA visited SUBJECT DOMAIN 2 to order a "Glock switch".  The UCA had previously visited SUBJECT DOMAIN 2 and observed it to advertise for sale "Glock switches" and silencers/suppressors.  The UCA was able to purchase one "Glock switch" from SUBJECT DOMAIN 2 for $159.98 via credit card.  Following the purchase, the UCA received a tracking number that showed the package originated in China and transited to the United States.  On or about January 8, 2024, the UCA retrieved a package from a government-controlled mailbox that contained one "Glock switch". On the "Glock switch" was Glock's trademarked logo.  CBP later advised when entering the United States, the cargo description for the package was "Toy".  This description is inaccurate and does not describe the actual item which was shipped.

60.     On or about December 22, 2023, the UCA visited SUBJECT DOMAIN 4 and SUBJECT DOMAIN 7 to purchase a "Glock switch".  For each website, the UCA was unable to complete an order as no payment option was available.  Both websites had a hyperlink for payment which redirected the UCA to SUBJECT DOMAIN 8[23].  The UCA had previously visited SUBJECT DOMAIN 8 and observed it to advertise for sale "Glock switches", auto sears,

_____

[23] As referenced above, SUBJECT DOMAIN 23 also redirected to SUBJECT DOMAIN 8.

and silencers/suppressors.  The UCA was able to purchase one "Glock switch" from SUBJECT DOMAIN 8 for $158.99 via credit card.  Following the purchase, the UCA received a tracking number that showed the package originated in China and transited to the United States.  On or about January 08, 2024, the UCA retrieved a package from a government-controlled mailbox that contained one "Glock switch".  On the "Glock switch" was Glock's trademarked logo.  CBP later advised when entering the United States, the cargo description for the package was "Toy".  This description is inaccurate and does not describe the actual item which was shipped.

61.     On or about December 22, 2023, the UCA visited SUBJECT DOMAIN 5 to purchase a "Glock switch".  The UCA had previously visited SUBJECT DOMAIN 5 and observed it to advertise for sale "Glock switches", auto sears, and silencers/suppressors.  The UCA was able to purchase one "Glock switch" from SUBJECT DOMAIN 5 for $129.99 via credit card.  Following the purchase, the UCA received a tracking number that showed the package originated in China and transited to the United States.  On or about January 8, 2024, the UCA retrieved a package from a government-controlled mailbox that contained one "Glock switch".  On the "Glock switch" was Glock's trademarked logo.  CBP later advised when entering the United States, the cargo description for the package was "Toy".  This description is inaccurate and does not describe the actual item which was shipped.

62.     On or about December 22, 2023, the UCA visited SUBJECT DOMAIN 15 to purchase a silencer/suppressor.  The UCA had previously visited SUBJECT DOMAIN 15 and observed it to advertise silencers/suppressors, marketed as "fuel filters" or "solvent traps" for sale.  The UCA was able to purchase one silencer/suppressor from SUBJECT DOMAIN 15 for $56.48 via credit card.  Following the purchase, the UCA received a tracking number that showed the package originated in China and transited to the United States.  On or about January

8, 2024, the UCA retrieved a package from a government-controlled mailbox that contained one silencer/suppressor.  CBP later advised when entering the United States, the cargo description for the package was "Motor".  This description is inaccurate and does not describe the actual item which was shipped.

63.     On December 22, 2023, the UCA visited SUBJECT DOMAIN 21 to purchase a silencer/suppressor.  The UCA had previously visited SUBJECT DOMAIN 21 and observed it to advertise silencers/suppressors, marketed as "fuel filters" or "solvent traps" for sale.  The UCA was able to purchase one silencer/suppressor for $83.95 via credit card.  Following the purchase, the UCA received a tracking number that showed the package originated in China and transited to the United States.  On or about January 8, 2024, the UCA retrieved a package from a government-controlled mailbox that contained one silencer/suppressor.  CBP later advised when entering the United States, the cargo description for the package was "Tool".  This description is inaccurate and does not describe the actual item which was shipped.

64.     On January 30, 2024, the UCA visited SUBJECT DOMAIN 25 to purchase a silencer/suppressor.  The UCA had previously visited SUBJECT DOMAIN 25 and observed it to advertise silencers/suppressors, marketed as "fuel filters" or "solvent traps" for sale.  The UCA was able to purchase one silencer/suppressor for $35.99 via credit card.  Following the purchase, the UCA received a tracking number that showed the package originated in China and transited to the United States.  On or about February 28, 2024, the UCA retrieved a package from a government-controlled mailbox that contained one silencer/suppressor.  CBP later advised when entering the United States, the cargo description for the package was "Nut".  This description is inaccurate and does not describe the actual item which was shipped.

65.     In March 2024, HSI New England Cyber Group conducted searches via the clear web for websites selling "Glock switches", auto-sears, and silencers/suppressors, marketed as "solvent traps" or "fuel filters".  During this time SUBJECT DOMAIN 11 was identified as selling "Glock switches" and auto sears.  The UCA observed the WhatsApp number (XXX) XXX-7289 displayed on the webpage which was the same number listed for SUBJECT DOMAIN 8.  On the main page were several neon signs and at the bottom were several "Glock switches" and auto sears.  A drop-down menu listed "Full Auto Sear" which when clicked, directed the UCA to a page that listed approximately eleven Glock switches or auto-sears for sale.  Upon clicking on a link for a Glock switch, the UCA observed several options such as black, gold, backplane, sear, AV, AS, lightning, red, and 3 pieces, which are common terms used to describe different forms of machine gun conversation devices.  Additional information showed Telegram and WhatsApp phone numbers of (XXX) XXX-4764 which are also associated with SUBJECT DOMAINS 1, 4, 7, and 8.  Continuing in March 2024, the UCA began the ordering process for a "Glock switch" on SUBJECT DOMAIN 11 which was listed on the site as "Stainless Steel Switch Keychain Standard Size Universal No Need Modification".  On the page was a "buy now" option or a Bitly link which re-directed to SUBJECT DOMAIN 21.  Using the "buy now" option the UCA was directed to enter their contact information and shipping information.  Two payment methods were observed, a credit card, or "Additional Payment Methods" which re-directed to airwallex.com and had options for Apple pay, and Google Pay.  Based on the commonality between SUBJECT DOMAIN 11 and other SUBJECT DOMAINS, it was apparent NFA-prohibited items could be purchased.

Grand Jury Subpoena Results

66.     In September 2023, HSI served GoDaddy.com, LLC with a subpoena to identify

subscriber information for several of the SUBJECT DOMAINS.  The results of the subpoena

linked several of the SUBJECT DOMAINS together, as they had all been purchased by the same

Shopper ID[24] and also identified additional domains purchased by the Shopper ID.  HSI agents

reviewed the additional purchased domains and observed a large majority of the domain names

had some form of "Glock" in the domain name or otherwise included the name of a specific

firearm model manufactured and trademarked by Glock (*e.g.*, "G17" and "G24").  HSI agents

visited these domains and observed them to be active but that they did not have content posted.

The remaining domains were actively registered with GoDaddy.com LLC and content could be

added at any time until their expiration.  Based on my training and experience, and discussions

with other HSI agents, I believe that the additional domains, SUBJECT DOMAINS 26 to 355,

were purchased by the Shopper ID in case SUBJECT DOMAINS 1 to 25 were seized by law

enforcement or otherwise shut down.  I am aware that if SUBJECT DOMAINS 1 to 25 were shut

down or seized, the content from SUBJECT DOMAINS 1 to 25 could easily be transferred to

SUBJECT DOMAINS 26 to 355 and they could become functional.  Based on this information,

the seizure warrant application includes SUBJECT DOMAINS 26 to 355.

Glock, Inc.

67.     Throughout this investigation HSI agents have communicated with a law firm

paid to represent Glock, Inc.  I am aware that during these communications agents have learned

---

[24] GoDaddy.com, LLC uses a "Shopper ID" number to uniquely identify a customer.

Glock, Inc. acquired 344 of the 355 SUBJECT DOMAINS[25] through Uniform Domain-Name Dispute-Resolution Policy ("UDRP") proceedings, cease-and-desist letters to the registrant(s) or web host(s) and pays the registration fees annually to maintain ownership of these domain names in order to keep them inactive.[26]  Glock, Inc. initiated the UDRP proceedings and cease-and-desist letters because the SUBJECT DOMAINS are violating Glock, Inc.'s trademark.

68.     On July 1, 2024, I queried the United States Patent & Trademark ("USPTO") website[27] and observed seventy-two registered trademarks for Glock, Inc.  Through a review of Glock, Inc.'s trademarks, I am aware the SUBJECT DOMAINS violate several trademarks registered by Glock, Inc.  In reviewing the SUBJECT DOMAINS and speaking with Glock, Inc., I am aware any domains using any of the Glock, Inc.'s trademarks in the domain name URL would be considered a violation of Glock's trademark, as would including the trademarked Glock logo on any merchandise.  Two examples are:

a.  The word "Glock", US Registration Number 4925475.

b.  The use of the Glock logo, US Registration Number 6831174.

69.     A complete list of the Glock, Inc., trademarks is provided in Attachment A-6.

<u>Control of the SUBJECT DOMAINS</u>

70.     A search of publicly available WHOIS domain name registration records revealed the date the SUBJECT DOMAINS were registered, through which registrar, and the registrant.

---

[25] Glock, Inc. does **not** own the following SUBJECT DOMAINS:  2, 3, 5, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 19, 20, 21, and 25.

[26] Glock, Inc., consents to the Government's seizure of the websites over which Glock, Inc. has control because Glock, Inc. will no longer have to pay the registration fees for those websites in order to prevent them from being used for nefarious purposes.

[27] https://tmsearch.uspto.gov

SUBJECT DOMAINS 1 to 6, 8 to 19, 22, 23, and 26 to 355 are registered with GoDaddy.com LLC., located at 100 S. Mill Ave., Suite 1600, Tempe, Arizona 85281.  SUBJECT DOMAIN 20 is registered at NameSilo LLC., located at 1300 E Missouri Ave, Suite A-110, Phoenix, Arizona 85014.  SUBJECT DOMAIN 21 and 25 are registered at Alibaba Cloud Computing Ltd. d/b/a HiChina and located in the Peoples Republic of China.  SUBJECT DOMAINS 7 and 24 are currently unregistered.  The entire list of the domains, their registrar, their registrant, and expiration dates are documented in Attachment A-2.

71.     The top-level domain for .com and .net SUBJECT DOMAINS is Verisign, a company located at 12061 Bluemont Way, Reston, VA 20190.

72.     The top-level domain for .us, .biz, and .vip SUBJECT DOMAINS is Registry Services LLC, 100 S. Mill Ave, Suite 1600 Tempe, AZ 85281.

73.     The top-level domain for .info SUBJECT DOMAINS is Identity Digital Inc., 10500 NE 8th Street Suite 750 Bellevue, WA 98004.

74.     The top-level domain for .org SUBJECT DOMAINS is Public Interest Registry, 11911 Freedom Drive 10th Floor, Suite 1000 Reston, VA 20190.

75.     The top-level domain for .porn SUBJECT DOMAINS is ICM Registry PN LLC, 100 S. Mill Ave, Suite 1600 Tempe, AZ 85281.

76.     The top-level domain for .adult SUBJECT DOMAINS is ICM Registry AD LLC, 100 S. Mill Ave, Suite 1600 Tempe, AZ 85281.

77.     The top-level domain for .support, .careers, .enterprises, .solutions, .email, .land, .tips, .today, .photos, .gallery, .directory, .legal, .systems, .company, .center, .world, .services, .technology, .media, .international, .school, and .marketing is Binky Moon, LLC - c/o Identity Digital Limited, 10500 NE 8th Street, Suite 750 Bellevue, WA 98004.

78.     The top-level domain for .social, .video, .reviews, .ninja, and .rocks is Dog Beach, LLC - c/o Identity Digital Limited, 10500 NE 8th Street, Suite 750 Bellevue, WA 98004.

### *SEIZURE PROCEDURE*

79.     As detailed in Attachment A-3, upon execution of the seizure warrants, the registry or registrar for the SUBJECT DOMAINS or top-level domain, shall be directed to restrain and lock the SUBJECT DOMAINS pending transfer of all right, title, and interest in the SUBJECT DOMAINS to the United States upon completion of forfeiture proceedings, to ensure that changes to the SUBJECT DOMAINS cannot be made absent court order or, if forfeited to the United States, without prior consultation with HSI.

80.     In addition, upon seizure of the SUBJECT DOMAINS by HSI, the registry, registrar, or top-level domain will be directed to point the SUBJECT DOMAINS to a particular IP address, which will display a web page notifying users that the SUBJECT DOMAINS have been seized.

81.     The registry, registrar, or top-level domain also maintain certain records relating to the owner of each domain name for which it is the top-level registry (the "Domain Name Records"), including the SUBJECT DOMAINS.  Certain of these records are available to the public through a "Whois" lookup through a web browser, among other means.  At the time the SUBJECT DOMAINS are seized, the registry, registrar, or top-level domain will be directed to change the "Technical Contact" and "Administrative Contact" fields of the Domain Name Records for the SUBJECT DOMAINS to contact information relating to HSI to reflect the fact that the SUBJECT DOMAINS have been seized, and to change the name server fields of the Domain Name Records to effect the forgoing changes.  All other fields will be changed so that they do not reflect any individual or entity.

82.     Upon completion of forfeiture proceedings, all Domain Name Records for the Subject Domains maintained by registry, registrar, or top-level domain will be changed to reflect the transfer of ownership to the U.S. government.

*CONCLUSION*

83.     For the foregoing reasons, I submit that there is probable cause to believe that the

SUBJECT DOMAINS are used in and/or intended to be used in facilitating and/or committing

violations of 18 U.S.C. § 545 (Smuggling goods into the United States) [SUBJECT DOMAINS

1-25]; and 18 U.S.C. § 2320(a) (Trafficking in counterfeit goods) [SUBJECT DOMAINS 1-14,

18, 22-24, and 26-355].  Accordingly, SUBJECT DOMAINS 1-25 are subject to seizure pursuant

to 19 U.S.C. § 1595a(a) and SUBJECT DOMAINS 1-14, 18, 22-24, and 26-355 are subject to

seizure pursuant to 18 U.S.C. § 2323(a)(1)(B) and 18 U.S.C. § 2323(b)(1).[28]


Sworn to under the pains and penalties of perjury this  26th  day of July, 2024.


*Adam Rayho /by Paul G. Levenson*
_____
Special Agent Adam Rayho
Homeland Security Investigations


Subscribed and sworn telephonically in accordance with Federal Rule of Criminal
Procedure 4.1 on July  26  , 2024.


Hon. Paul G. Levenson
United States Magistrate Judge

---

[28] As  noted above, the government is not seeking a seizure warrant with respect to SUBJECT
DOMAIN 25 from the Court at this juncture; because both the registry and top-level domain manager for
SUBJECT DOMAIN 25 are located abroad, the government intends to seek seizure of the domain via
international process.